# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 06-1074

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

WILLIAM A. GINGLEN,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Central District of Illinois.
No. CR 04-30052—**Jeanne E. Scott**, *Judge.*

ARGUED SEPTEMBER 28, 2006—DECIDED NOVEMBER 6, 2006

Before FLAUM, *Chief Judge,* and RIPPLE and EVANS, *Circuit Judges.*

FLAUM, *Chief Judge.* On July 8, 2005, William A. Ginglen pleaded guilty to seven counts of armed robbery, in violation of 18 U.S.C. § 2113(a) and (d), and two counts of using a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c). The district court sentenced Ginglen to concurrent 97-month terms on each of the seven bank robbery counts and 84-month and 300-month terms on the firearm counts. Section 924(c) requires the firearm sentences to run consecutive to each other and to the sentence on the armed robbery counts.

Because Ginglen pleaded guilty after the district court denied his motion to suppress evidence that police dis-

covered in his home, he reserved the right to appeal the district court's ruling. For the following reasons, we affirm.

## I. Background

Between November 10, 2003 and July 12, 2004, Ginglen robbed several central Illinois banks at gunpoint, netting a total of $56,382. On August 19, 2004, one of his three sons, Jared, who works as an officer for the Peoria Police Department, read a newspaper article about a serial bank robber in the area. The article caught his attention because the description of the perpetrator—five foot eight, two hundred pounds, and a male in his late fifties— sounded a lot like his father, and a description of the get-away car matched one owned by his parents. The article said that surveillance camera photographs of the perpetrator could be viewed on the Internet, so Jared went online to test his suspicions. Sure enough, Jared recognized the person in the photographs as his father.

He called his older brother, Garrett (who also lived in Peoria) to tell him about the website, and Garrett agreed that the person in the photographs was their father. Garrett told Jared that he was going to drive the thirty-five miles to Lewistown, where their parents lived, and Jared said that he wanted to go as well. He told Garrett to pick him up at his house so that he could change out of his police uniform. After Garrett picked up Jared, he called their younger brother, Clay, and told him about the website. Clay also recognized their father in the photographs.

The three brothers met at the Lewiston Fire Department to discuss what to do next. They agreed that for their father's safety and the safety of the people in their community, the robberies had to be stopped immediately. For this reason, they decided to go to their parent's house, confront their father, and convince him to turn himself in. If he refused, they planned to take him in forcibly.

The brothers proceeded with their plan. Jared wore a bulletproof vest and brought his gun and police badge. He wore the vest because he knew that his father was armed and did not know his father's state of mind. Clay first entered the unlocked house, followed by Garrett and then Jared. Garrett looked for his father on the first floor, and Clay and Jared searched upstairs, but their father was not home. During the course of the search, Jared and Clay saw a pair of shoes, pants, and a shirt that matched those worn by the robber in the photographs.

The brothers called the Lewiston Chief of Police and arranged to meet him at Clay's house. Police used the brothers' observations in their father's home to obtain a search warrant. The search uncovered the clothes matching those worn by the robber as well as cards and journals, which revealed that Ginglen was cheating on his wife and spending the robbery proceeds on his mistress. Four days after police executed the search warrants, Ginglen's wife voluntarily consented to the police seizing and searching the computer she shared with her husband.

All three brothers testified that they were raised in the home that they entered on August 19, 2004 and that they had the consent of their parents to enter it at any time. They said that they had entered the home uninvited several times in the past and that their parents never precluded them from going in certain rooms.

The district court denied Ginglen's motion to suppress on several grounds. First, it said that because all three brothers were acting as private citizens when they entered the home, the Fourth Amendment did not apply to their search. Second, it concluded that even if Jared was acting as a police officer, he had the consent of his parents to enter the home at any time, and the observations of the two other brothers independently supported the issuance of a search warrant. Finally, it concluded that even if the initial search

was illegal, the seizure and search of the computer was valid because Ginglen's wife independently consented to its removal from her home.

## II. Discussion

Ginglen argues that the district court should have suppressed the evidence obtained from his home, because Jared and his brothers acted as government agents when they entered and searched the home on August 19, 2004. This Court has not definitively resolved the standard of review of a district court's ruling that a person acted as a private individual when conducting a search. Prior to the Supreme Court's decision in *Ornelas v. United States*, 517 U.S. 690 (1996), we applied a clear error standard. *See United States v. Feffer*, 831 F.2d 734, 739 (7th Cir. 1987). In *Ornelas*, however, the Supreme Court instructed that we must review a district court's reasonable suspicion and probable cause determinations de novo, giving deference to the district court's findings of historical fact. 517 U.S. at 699. In *United States v. Shahid*, we raised, but did not decide, whether we should use the same standard when reviewing whether a person acted as a private individual when conducting a search. 117 F.3d 322, 325 (7th Cir. 1997). *Cf. United States v. Humphrey*, 208 F.3d 1190, 1203 (10th Cir. 2000) (holding that an appellate court reviews a district court's ultimate conclusion for clear error). As in *Shahid*, there is no necessity to address the issue, because regardless of whether our review of the district court's ultimate conclusion is de novo or something more deferential, the outcome is the same. Our review of the district court's findings of fact, however, remains unaffected by *Ornelas*: we examine them for clear error.

The Fourth Amendment's purpose is to protect citizens against unreasonable searches and seizures by the government. *See Camara v. Mun. Court of City & County of S.F.*, 387 U.S. 523, 528 (1967). It does not apply, however, to

searches or seizures performed by private individuals. *See United States v. Jacobsen*, 466 U.S. 109, 113 (1984). To determine whether an individual was acting as a private party or as an "instrument or agent" of the government, we examine " 'whether the government knew of and acquiesced in the intrusive conduct and whether the private party's purpose in conducting the search was to assist law enforcement agents or to further its own ends.' " *Shahid*, 117 F.3d at 325 (quoting *United States v. Koenig*, 856 F.2d 843, 847 (7th Cir. 1988)). "Other useful criteria are whether the private actor acted at the request of the government and whether the government offered the private actor a reward." *Id.* Ginglen bears the burden of proving that Jared and his brothers were acting as government agents when they entered Ginglen's home. *Id.*

In *Shahid*, we applied these factors to a search and seizure performed by a mall security guard and held that the guard acted as a private individual because he primarily acted "to provide safety and security for all persons on mall property." *Id.* at 326. Though the guard ultimately intended to turn the defendant over to law enforcement, we concluded that the security guard's separate motivation, to secure the mall's patrons and employees, was enough to demonstrate that he acted as a private individual. We further noted that even if the security guard had acted solely to assist law enforcement, he would not be considered a government agent unless the government knew or acquiesced in his action. Because nothing in the record suggested that the police induced mall security guards to search and seize persons on mall property, we declined to suppress the evidence obtained during the search. *Id.*

In *Koenig*, we similarly held that a Federal Express senior security specialist acted as a private individual, where he opened a package that he suspected contained narcotics. 856 F.2d at 849. We noted that the employee acted to protect other Federal Express employees' safety

and security and not solely to assist law enforcement. We also found relevant the fact that the government exercised no form of control over the employee. *Id.*

In this case, the district court found, after hearing the brothers testify, that they acted to protect their father and others from further harm, not to assist law enforcement. This finding was not clearly erroneous. The brothers' actions in entering the home are consistent with concerned sons attempting to prevent a misguided father from engaging in continued destructive behavior. Particularly noteworthy, they did not notify a police department before searching the home, they did not act to obtain a reward, and they did not collect evidence of the crimes while inside the home. The brothers may ultimately have intended to turn their father in to the authorities, but, like the security guard in *Shahid* and the Federal Express employee in *Koenig*, their primary objective was to protect the community from harm, not to assist law enforcement.

Ginglen attempts to avoid this conclusion by pointing to the fact that Jared wore a bulletproof vest and brought a police badge and gun to Ginglen's home. He argues that these facts definitively establish that Jared acted in his capacity as a police officer. We disagree. Jared testified that he always carries his gun and police badge and that he brought the bulletproof vest because he knew that his father owned guns. The district court did not err in crediting Jared's testimony, which is wholly consistent with a non-police-related motivation for entering his father's home.

The second factor mentioned in *Shahid* also weighs in favor of finding that the brothers acted as private individuals. Indeed, there is no indication that the government encouraged or acquiesced in the brothers' decision to enter their parents' home. Ginglen maintains that Garrett and Clayton were encouraged by the government insofar as Jared, an off-duty police officer, participated in the search. As discussed above, however, the district court was well

within its discretion to find that Jared was acting, not in his capacity as a police officer, but as a concerned son. The Ginglen home was outside of Jared's jurisdiction, and he had no authority to arrest his father absent exigent circumstances (which Ginglen acknowledges were not present). Furthermore, Jared took off his police uniform before driving to Lewiston, did not inform any of his superiors—or any other police department—that he intended to search the home, and did not instruct his brothers in how to carry out the search. These facts further support a conclusion that Jared was not acting as a police officer.

Our ruling is consistent with a number of state court decisions, which have held that an off-duty police officer acts as a government agent, where he or she stumbles upon criminal activity and attempts to collect evidence for law enforcement. *See, e.g.*, *Ex Parte Kennedy*, 486 So.2d 493, 495 (Ala. 1986) (holding that an off-duty police officer employed as an exterminator acts as a police officer where he removes a leaf from a plant he suspects to be marijuana while working in a home as an exterminator); *State v. Woods,* 790 S.W.2d 253, 259 (Mo. Ct. App. 1990) (holding that an off-duty police officer acts in his capacity as a law enforcement officer where he searches a cabin after observing marijuana in plain view while employed as a caretaker of the property); *Commonwealth v. Eshelman*, 383 A.2d 838, 842 (Pa. 1978) (holding that an off-duty police officer who encounters an abandoned car while looking for a friend in the woods acts in his capacity as a police officer where he retrieves a package he suspects contains marijuana and gives it to the local sheriff). *Cf. People v. Wolder*, 4 Cal. App. 3d 984, 993 (2d Dist. 1970) (holding that an off-duty police officer acts as a private individual where he searches his daughter's garage after becoming concerned that she may be conspiring with burglars).

In this case, Jared did not attempt to collect evidence while inside his father's home. Rather, like the officer

in *Wolder*, he discovered circumstances indicating that a family member was in serious danger and acted, as a responsible son would, by calling the police. His uniquely personal motivation requires us to conclude that he—and his brothers—acted as private citizens, and not as a government agents, when they entered their parents' home.

We note, as an independent basis for our holding, that even if one assumes that all three brothers had acted as government agents and illegally searched Ginglen's home, the district court correctly denied Ginglen's motion to suppress because police seized the evidence pursuant to a search warrant that contained untainted information sufficient to establish probable cause.[1] *See United States v. Markling*, 7 F.3d 1309, 1315-16 (7th Cir. 1993). In *Markling*, we held that under the independent source doctrine, a district court need not suppress evidence if (1) the illegally obtained evidence did not affect the magistrate's decision to issue the search warrant and (2) the decision to seek the warrant was not prompted by what was seen during the illegal search. *Id.*

*Markling* discussed the first element as follows:

> 'the fact that an application for a warrant contains information obtained through an unlawful entry does not per force indicate that the improper information "affected" [the magistrate's] decision to issue the warrant and thereby vitiate the applicability of the independent source doctrine. Rather, if the application contains probable cause apart from the improper information, then the warrant is lawful.'

*Id.* at 1317 (quoting *United States v. Restrepo*, 966 F.2d 964, 970 (5th Cir. 1992). Thus, *Markling* instructs that if the

---

[1] Though the government raised this argument as a separate basis for affirmance, Ginglen did not respond to it in his reply brief.

search warrant for Ginglen's home was supported by probable cause—omitting the evidence seen by Ginglen's sons inside the home—then the evidence need not be suppressed.

Examining the search warrant affidavits in this light, facts untainted by the brothers' observations in the home created probable cause to support the issuance of a search warrant. The affidavits averred that all three brothers identified the person in the website photographs as their father, that the brothers' description of their father matched the description provided by the robbery victims, that Jared recognized the gun in the picture as one owned by his father, and that investigators observed a car matching the one driven by the robber parked in Ginglen's driveway. This information established probable cause to believe that Ginglen was the bank robber and that a search of his residence would reveal evidence of his crimes. *See Doescher v. Estelle*, 666 F.2d 285, 288 (5th Cir. 1982) (holding that police have probable cause to search the defendant's home where two eyewitnesses identify the defendant as the person who robbed a supermarket, the vehicle used in the robbery is registered to a man living at the defendant's home, and an anonymous informant claims that the defendant committed the robbery and stored the gun used in the robbery at his home).

The government also established, with regard to the second element discussed in *Markling*, that the brothers' decision to go to the police was not prompted by what they saw in their parents' home. The brothers' testimony, as well as the district court's findings, establish that the brothers decided to contact the police shortly after observing their fathers' picture on the website, not after they saw the corroborating evidence in the home. They simply wanted to provide their father an opportunity to turn himself in before making that phone call to the police.

As a result, the district court did not err by denying Ginglen's motion to suppress because the search warrant was valid under the independent source doctrine.

### III.  Conclusion

For the reasons stated above, we AFFIRM Ginglen's conviction and sentence.

A true Copy:

   Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*