# IN THE SUPREME COURT OF IOWA

No. 15–1576

Filed February 10, 2017

Amended April 25, 2017

**STATE OF IOWA,**

Appellee,

vs.

**CHRISTOPHER D. BROWN,**

Appellant.

Appeal from the Iowa District Court for Scott County, Henry W. Latham II (suppression hearing), John D. Telleen (suppression hearing), Mary E. Howes (bench trial and sentencing), and Mark D. Cleve (bench trial), Judges.

A defendant appeals the district court's denial of two motions to suppress based on searches conducted by his stepfather, an off-duty police officer. **DISTRICT COURT JUDGMENTS AFFIRMED.**

Lauren M. Phelps, Davenport, for appellant.

Thomas J. Miller, Attorney General, Genevieve Reinkoester, Assistant Attorney General, Michael J. Walton, County Attorney, and Kelly Cunningham, Assistant County Attorney, for appellee.

**ZAGER, Justice.**

The defendant appeals from the denial of two separate motions to suppress evidence based on his stepfather's actions as an off-duty police officer. In each case, the defendant's stepfather conducted a search and seized firearms and drugs. Defendant's stepfather is a police officer with the Davenport Police Department. However, each search was conducted while the stepfather was off duty. The defendant alleges the searches are unconstitutional because his stepfather was not acting in a parental capacity, but rather conducted the searches while exercising state action as a law enforcement official. The district court denied each motion to suppress, finding there was no state action. After waiving his right to a jury trial, trials were held to the court. After the bench trials, the defendant was found guilty of the charges and sentenced accordingly. The defendant now appeals the district court denials of the motions to suppress. For the reasons stated below, we hold the stepfather was not engaged in state action at the time of either search and no constitutional claims are implicated. We affirm the judgments of the district court.

### I. Background Facts and Proceedings.

The defendant, Christopher D. Brown, appeals his convictions and sentences following two bench trials. He challenges the underlying searches in each of the two cases, arguing that his stepfather's employment as a police officer, and other attendant facts, converted each search into state action.

**A. The First Search—Case Number FECR368292.** On February 5, 2015, Brown's mother, Lynne Kilburg, received a phone call from his aunt, Cindy Keimig. Cindy informed Lynne that she believed Brown was in possession of her husband's gun. Brown had visited her son, his

cousin Marcus, at the Keimigs' home the night before, and Marcus believed Brown took the gun when he left.

Brown spent the night with Marcus at the Keimig home on February 4. Marcus always kept one of his father's guns under the mattress in his bedroom. When Marcus checked for the gun on the morning of February 5, he discovered it was gone. He searched the room for the gun and found it under the cushion where Brown was sitting. Marcus told Brown that hiding the gun "was not cool" and Brown should have told him where the gun was while he was looking. Marcus and Brown left the Keimig residence and got into Marcus' car to leave. Brown said he forgot his wallet and returned to the house before Marcus brought him home.

After dropping Brown off, Marcus left for training with the National Guard. When he returned home at the end of the day, he realized the gun was missing again. He informed his parents the gun was missing and told them he believed Brown took it. Cindy then called Lynne to tell her that Marcus believed Brown took the gun and that she and Marcus were going to drive to Brown's workplace to ask him about it. Upon their arrival at Brown's workplace, Cindy and Marcus saw Brown driving away.

After Lynne talked to Cindy, she called Brown's father, Richard Brown. Lynne was concerned because Brown was on probation and suffering from depression. Lynne was worried that Brown had taken the gun because he was suicidal. Lynne asked Richard if he had a key to Brown's apartment so she could let herself in and look for the gun, but Richard did not.

Lynne then called Brent Kilburg, her husband and Brown's stepfather. Lynne and Brent have been married since Brown was three

years old, and Lynne, Brent, and Richard co-parented Brown. Brent is a police officer for the Davenport Police Department. Lynne told Brent that the Keimigs believed Brown had taken a gun, that she was concerned about Brown due to his probation and depression, and that she and the Keimigs were going to Brown's apartment to speak with him and try to obtain the gun. Brent was off duty at the time of Lynne's phone call and decided to accompany everyone to Brown's apartment. He did not contact law enforcement at this time because he believed it was a family matter.

When the family arrived at Brown's apartment, they initially waited outside while they discussed what their course of action should be. They were concerned about Brown's mental state and whether he would harm himself with the gun. While they were standing outside and trying to decide how to approach Brown, they saw him leave the parking lot of his apartment building and drive down the street where they were standing. Lynne began signaling for Brown to stop, and Brent moved to the street to stand in front of Brown's car. Brent motioned for Brown to pull over, and both he and Lynne approached the passenger side of Brown's car.

Brent asked Brown to turn off his car and pull the key out of the ignition. Brent and Lynne both asked Brown about the missing gun, but Brown denied having possession of it. Both Lynne and Brent then observed a silver glint at Brown's hip, which they believed was the missing gun. Brent opened Brown's passenger side door, asked Brown to put his hands on his steering wheel, and then checked Brown's person and pockets. Brent found two knives on Brown's person and Brown's cell phone. Brent saw that Brown had a backpack in the car, and he moved the backpack closer to him in case it contained the gun.

Lynne and Brent then asked Brown to get out of the car, and he complied. Lynne again asked Brown about the gun, and he again denied he had it. Lynne then asked Brent to search Brown to see if he had the gun, and Brent found the gun in Brown's waistband. Dana Keimig, Brown's uncle, positively identified the gun as the one he was missing and put it in his vehicle.

Brown became upset, and Lynne told him to stay there with the family instead of getting in his car and leaving. Lynne wanted to see if she could either civilly commit Brown for depression and suicidal ideations, or if she could find any services for Brown that could offer an intervention. Lynne believed Brown would stay if she retained his possessions. Lynne took his cell phone and placed it in his backpack. She also took possession of Brown's wallet and knives and placed all of the items in her vehicle. She and Brown sat in the vehicle together talking. While they were sitting in the vehicle, Brown's cell phone rang repeatedly. Brown wanted to answer his cell phone and was agitated when he could not. Lynne ultimately retrieved the backpack and began to look for the cell phone. While looking in the backpack for the cell phone, Lynne discovered a bag that she believed contained marijuana, as well as drug paraphernalia.

Because Brown was on probation for a marijuana-related offense, Lynne informed Brent, Dana, and Marcus about the marijuana she found in Brown's backpack. Lynne and Brent called Richard to discuss what they needed to do, and they mutually agreed they should call law enforcement. Brent testified that once the marijuana was found, he knew he needed to inform law enforcement, step back, and let the other officers handle the matter.

Brent called two of his supervisors, Sergeants Lindbom and Jensen. After the phone call, he remained uninvolved other than providing a statement to Sergeant Jensen. At approximately 4:29 p.m., Officer Stegall arrived at the apartment building. Brent informed Officer Stegall that Brown was his stepson, he found a gun on Brown's person, and his wife found marijuana in Brown's backpack. Officer Stegall then conducted a pat down on Brown to determine whether he had any more weapons and placed him in the backseat of his squad car. Officer Stegall read Brown his *Miranda* rights at approximately 4:39 p.m. After reading Brown his *Miranda* rights, Brown consented to an interview with Officer Stegall.

During the interview, Brown told Officer Stegall he had previously been arrested for possession with intent to deliver marijuana, and he was currently on probation. Brown told Officer Stegall his family, including his stepfather, was at his apartment to retrieve an airsoft pistol that belonged to his uncle. He said his family found the airsoft pistol and "other stuff" in his car, but did not elaborate on what the "other stuff" was. The interview ended, and Officer Stegall remained with Brown.

At the time of the original contact with law enforcement, Sergeant Jensen spoke on the phone with Brent. Brent advised him that the situation was "a long story" and it would be easier for Sergeant Jensen to just respond to the apartment. Upon his arrival, Sergeant Jensen spoke with Brent, Lynne, Dana, and Marcus. Brent recounted the events of the day and informed Sergeant Jensen that Brown was his stepson and was on probation after receiving a deferred judgment for a charge of possession with intent to deliver marijuana. Sergeant Jensen asked the family where the gun and backpack were, and Brent retrieved the items

and turned them over to Sergeant Jensen. Sergeant Jensen placed the items in Officer Stegall's squad car.

Officer Stegall informed Sergeant Jensen that Brown was given his *Miranda* rights and Brown had consented to a brief interview. Sergeant Jensen told Brown his *Miranda* rights were still in effect and asked him if he would consent to another interview. Brown consented. Sergeant Jensen asked Brown if there was anything illegal in his apartment or backpack, and Brown answered affirmatively to both questions. Sergeant Jensen asked for consent to search Brown's apartment and vehicle, to which Brown agreed. Officer Stegall filled out the consent to search form for both the apartment and the vehicle. Brown signed the consent forms and told the officers he wanted to be present during both searches. Lieutenant Biggs and Sergeant Jensen searched Brown's vehicle first and did not locate anything of a criminal nature. Lieutenant Biggs and Sergeant Jensen then searched Brown's apartment, where they discovered drug paraphernalia.

On February 25, Brown was charged with possession of a controlled substance in violation of Iowa Code section 124.401(1)(*d*) (2013), failure to affix drug tax stamp in violation of Iowa Code section 453B.12, and felon in possession of a firearm in violation of Iowa Code section 724.26(1).

**B. The Second Search—Case Number FECR368787.** After his initial arrest, Brown moved into Lynne and Brent's home. Brown was not working during this time, had no money, and had nowhere else to live. Within a relatively short period, Lynne began to suspect Brown was using and selling marijuana again.

The morning of February 21, one of Lynne and Brent's younger children woke Lynne up to ask if he could play the new Xbox gaming

console that was in the living room. Lynne was surprised because the family did not own an Xbox and had not purchased one. Her son told her it belonged to Brown. Because Brown was not working, Lynne became concerned that Brown had used money obtained from selling drugs to buy the gaming console. She decided to search Brown's car, which was parked in her driveway, to confirm her suspicions that Brown was selling drugs again. She searched the interior of Brown's car but did not find anything. She wanted to obtain access to the trunk of the car but did not have the keys. Lynne went back inside the house.

After Brown left his bedroom to use the bathroom, Lynne entered his bedroom to search for the car keys. She could not find his keys, but did look through his cell phone for evidence of drug selling. Based on the messages she found on his cell phone, Lynne concluded Brown was selling drugs again and decided that she was going to tell him he needed to leave the house.

After Brent woke up, Lynne briefly informed him about the text messages she found on Brown's cell phone and that she intended to tell Brown to leave. Lynne confronted Brown and told him he needed to leave. While he was packing, Lynne began arguing with him because she believed he was stalling. Lynne called the sheriff's office to ask them to come over and make Brown leave. Once she realized Brown was going to finish packing and leave, she called the sheriff's office again and asked them not to come.

While Lynne and Brown were arguing, Brent left the house to go search Brown's car. Brent was concerned about Brown's behavior because he did not want him to make a decision that would "ruin his life [or] ruin somebody else's life." During the search, Brent was able to fold down the backseat in Brown's car to access the trunk. In the trunk,

Brent found a shoebox and a cell phone box, in addition to other items. He opened both boxes and found a loaded 9mm gun in the shoebox and marijuana in the cell phone box. Brent placed the gun and marijuana in his coat pocket. At this time, Brown left the house. Brent stepped back from the car and allowed Brown to drive away.

Brent returned to the house and told Lynne what he found in Brown's car. Brent said they needed to call the sheriff's office, and Lynne agreed. They called the sheriff's office and asked that they send someone to their house on a nonemergency call. When Deputy Skalla arrived, Brent and Lynne described what happened, and Brent turned over the gun and marijuana he found in Brown's vehicle. Lynne had retained Brown's cell phone after she discovered the text messages and also turned the cell phone over to Deputy Skalla.

Deputy Skalla obtained a search warrant for the cell phone based on the gun and marijuana found in Brown's vehicle, the new Xbox, Lynne's description of the text messages, and Brown's probation status. An arrest warrant was issued on March 20, and Brown was arrested the same day. Brown was charged with possession of a controlled substance in violation of Iowa Code section 124.401(1)(*d*) and felon in possession of a firearm in violation of Iowa Code section 724.26(1). The trial information added conspiracy to commit a nonforcible felony in violation of Iowa Code sections 706.1(1)(*a*) or (*b*), 706.3, and 703.1.

**C. Proceedings.** On April 17, Brown filed a motion to suppress the evidence discovered as a result of his stepfather's first search, which the district court denied. Brown waived his right to a jury trial, and the court held a bench trial on May 26. Brown stipulated to a bench trial on

the minutes of testimony and the State's evidence. The district court found Brown guilty of all three counts.[1]

On May 22, Brown filed a motion to suppress the evidence discovered as a result of his stepfather's second search, which the district court denied. The district court held a bench trial and on July 20 found Brown guilty of possession with intent to deliver marijuana and felon in possession of a firearm.

On August 20, the district court sentenced Brown to five years in prison with credit for time served on each of the three counts in case FECR368292. Each of the three sentences was to run concurrently. The district court also sentenced him to five years in prison with credit for time served for the two counts in case FECR368787. The sentences were to run concurrently. The sentence in FECR368787 was also to run concurrently with the sentence in FECR368292. Brown appealed, arguing the district court erred in denying his motions to suppress in both cases. We retained the appeal.

## II. Standard of Review.

When a defendant challenges a district court's denial of a motion to suppress based upon the deprivation of a state or federal constitutional right, our standard of review is de novo. *In re Property Seized from Pardee*, 872 N.W.2d 384, 390 (Iowa 2015). When we review a record de novo, we make "an independent evaluation of the totality of the circumstances as shown by the entire record." *Id.* (quoting *State v. Tyler*, 867 N.W.2d 136, 152 (Iowa 2015)). "We give deference to the district court's fact findings due to its opportunity to assess the credibility of the

---

[1]Brown was found guilty of possession with intent to deliver a schedule I controlled substance (marijuana) in violation of Iowa Code section 124.401(1)(*d*) (2013), failure to affix drug tax stamp in violation of Iowa Code section 453B.12, and felon in possession of a firearm in violation of Iowa Code section 724.26(1).

witnesses, but we are not bound by those findings." *Id.* (quoting *Tyler*, 867 N.W.2d at 153).

**III. Analysis.**

Brown argues the district court erred in denying his motions to suppress in both cases because the searches conducted by his stepfather violated both the United States Constitution and the Iowa Constitution. The Fourth Amendment provides,

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV. Article I, section 8 of the Iowa Constitution is the "*nearly* identical [provision] to the Fourth Amendment to the United States Constitution." *State v. Short*, 851 N.W.2d 474, 500–01 (Iowa 2014) (discussing the differences in punctuation between the Iowa Constitution and the Federal Constitution and how members of this court have interpreted said differences). It provides,

> The right of the people to be secure in their persons, houses, papers and effects, against unreasonable seizures and searches shall not be violated; and no warrant shall issue but on probable cause, supported by oath or affirmation, particularly describing the place to be searched, and the persons and things to be seized.

Iowa Const. art. I, § 8.

Although the provisions are similar and "were generally designed with the same scope, import, and purpose, we jealously protect this court's authority to follow an independent approach under our state constitution." *State v. Pals*, 805 N.W.2d 767, 771 (Iowa 2011). While Brown does not request that we apply a different standard to analyze the Iowa Constitution, "even where a party has not advanced a different

standard for interpreting a state constitutional provision, we may apply the standard more stringently than federal caselaw." *State v. Kooima*, 833 N.W.2d 202, 206 (Iowa 2013). However, "our independent authority to construe the Iowa Constitution does not mean that we generally refuse to follow the United States Supreme Court decisions." *Short*, 851 N.W.2d at 490. Instead, what we require "is not mere identification of a potentially analogous federal precedent, but exercise of our best, independent judgment of the proper parameters of state constitutional commands." *Id.* When both federal and state constitutional claims are raised, we have the discretion to consider either claim first or to consider both claims simultaneously. *State v. Ochoa*, 792 N.W.2d 260, 267 (Iowa 2010).

The Fourth Amendment protects persons from unreasonable intrusions by the government upon their legitimate expectation of privacy. *State v. Lewis*, 675 N.W.2d 516, 522 (Iowa 2004). This protection includes unreasonable intrusions made by law enforcement officers. *Id.* However, the Fourth Amendment only applies to searches performed by the government, and not the actions of private individuals. *See State v. Campbell*, 714 N.W.2d 622, 631 (Iowa 2006); *see also State v. Flynn*, 360 N.W.2d 762, 764–65 (Iowa 1985). Brown argues that the nature of his stepfather's employment as a law enforcement officer prevented him from acting as a private citizen when he conducted the searches. Brown argues that his stepfather's searches were government action, and therefore, he was required to abide by the search and seizure provisions of the Fourth Amendment and article I, section 8 of the Iowa Constitution.

We have never addressed the specific question raised in this appeal. However, other jurisdictions that have considered the issue have

rejected the idea that an off-duty law enforcement officer can *never* perform a search as a private individual. Instead, these jurisdictions apply one of two tests to determine the capacity in which the officer was acting at the time of the search. *See, e.g., United States v. Cintron*, 482 F. App'x 353, 356 (10th Cir. 2012) ("Determining when an individual is acting as a private citizen or a government actor can be difficult, including when the individual is an off-duty police officer working as a security guard."); *United States v. Ginglen*, 467 F.3d 1071, 1075 (7th Cir. 2006) (applying a test to determine whether an off-duty police officer acted as a private party or government agent); *State v. Walker*, 459 N.W.2d 527, 532 (Neb. 1990) ("We reject the notion that solely because one is a police officer, the officer acts in that capacity at all times."); *State v. Santiago*, 217 P.3d 89, 95–96 (N.M. 2009) (applying a two-step test to analyze whether police officers were acting as private actors or on behalf of the government); *State v. Young*, 12 A.3d 510, 514 (Vt. 2010) ("Any determination of whether an off-duty police officer is acting as a private person when making a search or seizure must be based on all the circumstances of the case."). We agree, and reject the idea that an off-duty police officer is acting as a government agent in every situation.

**A. Test One—Instrument or Agent of the Government.** Under the first test, courts ask whether an individual was acting as a private citizen or as an "instrument or agent" of the government, and the test is not limited solely to analyzing the actions of off-duty police officers. *See Ginglen*, 467 F.3d at 1074. The key question is "whether the government knew of and acquiesced in the intrusive conduct and whether the private party's purpose in conducting the search was to assist law enforcement agents or to further its own ends." *Id.* (quoting *United States v. Shahid*, 117 F.3d 322, 325 (7th Cir. 1997)). Courts also consider "whether the

private actor acted at the request of the government and whether the government offered the private actor a reward." *Id.* The courts look to the individual's "primary objective" to determine whether they acted to assist law enforcement or to further their own ends. *See, e.g., id.* at 1075.

In *Ginglen*, the court found that three brothers who searched their father's home for evidence of a robbery were acting in their own private capacity and not as agents of the government. *Id.* at 1073, 1075. One of the brothers was an officer for the Peoria Police Department. *Id.* at 1073. After reading an article about a serial bank robber, he called his brothers who agreed with him that the description of the perpetrator sounded like their father. *Id.* The brothers decided to go to their father's home, confront him with the evidence, and try to convince him to turn himself in. *Id.* The brothers wanted to stop the robberies from occurring for both their father's safety and the safety of the community, so they agreed they would take him to the police station by force if he did not agree to turn himself in. *Id.*

While they were at their father's house, the brothers found clothing that matched the clothing worn by the robber. *Id.* They called the chief of police and arranged to meet him at the house of one of the brothers. *Id.* Based on the observations of the three brothers, the police were able to obtain a search warrant. *Id.* The court held that the brothers were acting as concerned sons who wanted to prevent their father from engaging in destructive behavior. *Id.* at 1075. The court found a few factors particularly relevant in making this determination: the brothers did not notify any police before going to their father's house, they did not make the decision to search the home for any reward, and they did not collect any evidence. *Id.* The court held that their primary objective was

not to assist law enforcement, but rather to protect the community and their father from future harm. *Id.*

In contrast, we considered whether off-duty police officers were acting as government agents in *State v. Carter,* 267 N.W.2d 385 (Iowa 1978). In that case, Veterans Auditorium employed approximately twenty-five off-duty Des Moines police officers to serve as security guards during events. *Id.* at 386. Although the officers were off-duty, they wore uniforms and were armed while they worked at the auditorium. *Id.* We found that the officers were acting as government agents for a number of reasons. *Id.* First, while they were working at the auditorium, the officers were uniformed and carrying weapons. *Id.* Second, the officers were able to make arrests and did in fact arrest the defendant. *Id.* Finally, the arrangement to have the off-duty officers work events was made between the auditorium and the Des Moines Police Department. *Id.* at 386–87.

**B. Test Two—Actions of Off-Duty Police Officers.** The second test that some courts utilize to determine whether an off-duty police officer acted as a private citizen or in an official capacity is a two-part test:

> First, we must examine the capacity in which the off-duty police officer was functioning when the officer initially confronted the situation and second, we must examine the manner in which he or she conducted himself or herself from that point forward.

*United States v. Couch,* 378 F. Supp. 2d 50, 55 (N.D.N.Y. 2005) (quoting *State v. Andrews,* 637 A.2d 787, 791 (Conn. App. Ct. 1994)). Unlike the first test, this test is restricted solely to analyzing the actions of off-duty police officers. Under this test, when courts consider the manner in which the off-duty officer conducted himself or herself, the question is

whether the officer's actions fell "outside [the] sphere of legitimate private action." *Armstrong v. State*, 46 So. 3d 589, 594 (Fla. Dist. Ct. App. 2010) (quoting *Commonwealth v. Leone*, 435 N.E.2d 1036, 1041 (Mass. 1982)). In making this determination, the crucial question is whether the search was motivated by a legitimate private interest or solely by a governmental purpose. *Id.* While the first test can be applied to any citizen, this second test is applied specifically to analyze the actions of off-duty police officers and thus is more applicable to the searches involved here. We now adopt this test to address the question of whether an off-duty police officer acted as a private citizen or in his or her official capacity while conducting a search.

There are a number of cases in which courts have held that an off-duty officer was not acting in his or her capacity as a law enforcement official, but rather was acting as a private citizen. In *United States v. Abney*, the court held that an off-duty police officer, Hernandez, working as a private security guard was not acting in his governmental capacity when he questioned a customer about counterfeit bills and asked the customer to empty his pockets. 2003 WL 22047842, at *5 (S.D.N.Y. Aug. 29, 2003). In his role as a security guard, Hernandez's purpose in questioning the customer and asking him to turn out his pockets was for the purpose of his employment as a security guard—he wanted to ensure counterfeit money was not used in the store. *Id.*

In *Walker*, the court held an off-duty officer who was also a landlord did not act in his law enforcement capacity when he entered a tenant's apartment to check on repairs and observed drug paraphernalia. 459 N.W2d at 532. The landlord, Davitt, gave the tenant notice that he was going to enter the unit at 5:30. *Id.* at 529. While he did not give a specific reason for the visit, Davitt testified that he intended to check on

the status of repairs and to speak with the tenant about being late in paying utilities, rent, and the security deposit. *Id.* at 532. Although Davitt was informed of suspected drug use prior to entering the unit, the only room he entered was the room where repairs were supposed to be performed. *Id.* at 532–33. Once he discovered drug paraphernalia in that room, Davitt asked the tenants if he could use their telephone and called the narcotics unit of the Omaha Police Division. *Id.* at 530. He told the tenants that police officers were on their way and advised them to wait in the living room. *Id.* Once he found the drug paraphernalia, Davitt left the room, informed the police of what he found, and waited for the officers to arrive. *Id.* at 533.

In *People v. Wachter*, an off-duty sheriff, Stephens, went fishing with his friend on the friend's property. 130 Cal. Rptr. 279, 281 (Ct. App. 1976). After they finished fishing, the friend suggested they visit an acquaintance's property. *Id.* They arrived at the property and found the acquaintance was not home, but Stephens' friend continued to show him around. *Id.* The two men observed a few facilities on the property, including a covered garden. *Id.* While they were in the garden, Stephens noticed a green water hose and followed it down a slope to a cultivated garden plot. *Id.* At this plot, Stephens saw what he believed to be marijuana plants. *Id.* Stephens described the plants to his friend, and they left to return to the friend's house. *Id.* After Stephens returned home, he called the deputy sheriff in charge of narcotics investigations and reported what he saw at the property. *Id.* The court held that Stephens had acted as a private citizen when he entered the property with his friend and discovered the marijuana. *Id.* at 286–87.

In *State v. Pearson*, the defendant left her vehicle at a garage for servicing. 514 P.2d 884, 884–85 (Or. Ct. App. 1973). The mechanic at the

garage, Barrick, was also a reserve police officer. *Id.* at 885. When Barrick first opened the door to the vehicle, he immediately smelled a strong odor of marijuana. *Id.* He looked at the car's ashtray and observed several marijuana roach butts, which he recognized because of his training as a reserve officer. *Id.* Barrick called the police station to report his findings. *Id.* Once the police officer arrived at the garage, Barrick took the officer to the car, removed the car's ash tray, and showed the officer the tray and its contents. *Id.* The court found that Barrick was not acting in his official capacity when he discovered the marijuana in the vehicle. *Id.* at 887.

In *Andrews*, an auxiliary police officer, Sampson, was driving his personal vehicle home after he finished his shift at the police department. 637 A.2d at 789. Although he was driving his own vehicle, Sampson was still dressed in his uniform. *Id.* While driving home, Sampson observed the defendant, Andrews, driving his vehicle erratically. *Id.* Sampson saw Andrews run a stop sign, cross over the centerline of the road, drive on the opposite side of the road, and strike the curb with his vehicle a number of times. *Id.* Sampson called the police department from his personal cell phone to report the erratic driving, and continued to follow Andrews. *Id.* Because Andrews continued to drive dangerously, Sampson flashed his headlights at the car and turned on the blue flashing light he had in his vehicle from his work as a volunteer firefighter. *Id.* Andrews pulled over, and Sampson turned his lights off and approached the vehicle. *Id.* He asked Andrews to wait for the police to arrive, but did not ask any questions or ask for any information. *Id.* Andrews handed Sampson his license and registration, but Sampson gave the items back and returned to his own vehicle while they waited for the police. *Id.* Once the police arrived,

Sampson explained the driving he observed. *Id.* The officers approached Andrews's vehicle, and they smelled alcohol on Andrews's breath and observed slurred speech. *Id.* They asked Andrews to perform field sobriety tests, which he failed. *Id.*

The court found that Sampson was acting in his private capacity when he first observed Andrews's erratic driving. *Id.* at 791. Sampson was off duty, outside his normal jurisdiction, and driving his personal vehicle. *Id.* The court also found that Sampson conducted himself as a private citizen and not as a police officer after his observation of erratic driving. *Id.* Sampson called the police and notified them of the location of the dangerous driving. *Id.* It was only after Andrews was unable to remain on the traveled portion of the highway that Sampson flashed his lights in an attempt to get the vehicle to pull over. *Id.* Although Andrews provided them, Sampson never requested the license and registration, nor did he keep them after Andrews provided the documents. *Id.* Sampson did not administer any sobriety tests or take Andrews into custody. *Id.* The court ultimately concluded that Sampson acted as a private citizen, and there was no government action. *Id.*

Under this test, we hold that Brent was not acting in his public capacity as a law enforcement officer while he was conducting either of the searches. Instead, Brent was acting in his private capacity as a stepfather. In the first search, Brent and Lynne stopped Brown's vehicle because they were concerned for him, as his parents. Both Brent and Lynne attempted to stop Brown's car as he drove down the street toward their family. While Brent has certain responses due to his training as a law enforcement officer, when Brent jumped in front of Brown's car and yelled at him to stop, he was not utilizing any specialized training he received as an officer. Rather, jumping in front of Brown's moving car

and yelling at him to stop was a parent's response to an emotionally charged situation. Both Brent and Lynne, in addition to the other family members, were worried that Brown had taken his uncle's gun because he was depressed. They were concerned about his mental state and that he would engage in self-harm or perhaps harm to others. Brent's initial search of Brown and his vehicle was to find the gun and return it to Brown's uncle. While sitting in her vehicle with Brown, Lynne was trying to decide the family's next options: whether there were any services or interventions available for Brown due to his mental health. After several interruptions when Brown's cell phone was ringing, Lynne opened the backpack and discovered the marijuana. It was only after this discovery that Brent, Lynne, and Richard mutually decided they needed to call law enforcement. After calling his supervisors to explain the situation, Brent ceased any involvement. He gave statements to the officers when they arrived, but he did not conduct any interview with Brown or assist the law enforcement officers in their searches of Brown's vehicle or apartment.

During the second search, Brent was again acting in his capacity as a concerned parent rather than as a government actor. Brown was living with Brent and Lynne because they were concerned about his mental state, he was unemployed, and he had nowhere else to go. After living with them for only a short time, they became concerned that he was using or selling drugs. After Lynne told Brent about the text messages she found on Brown's cell phone that made her believe he was selling marijuana, Brent went outside to search Brown's vehicle to confirm or deny their suspicions. Brent was concerned that Brown was making decisions that would "ruin his life." While Brent was searching the vehicle, he was not aware that Lynne had called the sheriff because

she believed Brown was stalling. Further, once Lynne realized Brown was packing and intended to leave, she called the sheriff again and asked them not to come. Once Brent found a gun and marijuana in Brown's car, Brent did not detain Brown. While he did retain the gun and marijuana, he stepped back from Brown's vehicle and let him leave. After Brown left, he went back inside to consult with Lynne about what he had found and what they needed to do. They mutually decided they had to contact law enforcement and called the nonemergency line for the sheriff's office. Once the officer arrived, Brent and Lynne gave the officer their narrative of the events and turned over the gun and marijuana. Again, Brent did not assist in the request for a search warrant or the resulting search.

We conclude that Brent was not acting in his capacity as a law enforcement officer during either of the searches. When initially confronted with the situations, Brent was at all times acting as a concerned parent and not as a law enforcement officer. His subsequent actions also do not indicate that he was acting as anything other than a concerned parent. Under this test, the crucial question is whether the search was motivated by a legitimate private interest or solely by a governmental purpose.

There is no doubt that both of the searches in this case were purely private in nature. In each search, Brent confronted the situation in his capacity as a private citizen—a stepparent—and his conduct moving forward indicated that he continued to act in his role as a concerned parent. *See, e.g.*, *Andrews*, 637 A.2d at 790–91. Neither the Fourth Amendment nor article I, section 8 of the Iowa Constitution applies to searches performed by private individuals. *See Campbell*, 714

N.W.2d at 632; *see also Flynn*, 360 N.W.2d at 764–65. As such, neither the Federal nor the Iowa Constitution was violated.

### IV. Conclusion.

For the above reasons, we hold that the defendant's off-duty police officer stepfather was acting in his private capacity, and not in his governmental capacity as a law enforcement officer, when he conducted the searches of the defendant's person and vehicle. We therefore conclude that the district court was correct in denying each of the motions to suppress filed in these cases and affirm the judgments.

**DISTRICT COURT JUDGMENTS AFFIRMED.**