In the

# United States Court of Appeals

## For the Seventh Circuit

No. 23-1108

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JAVARES L. HUDSON,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Central District of Illinois.
No. 22-cr-10006 — **James E. Shadid**, *Judge.*

ARGUED SEPTEMBER 26, 2023 — DECIDED NOVEMBER 16, 2023

Before WOOD, SCUDDER, and ST. EVE, *Circuit Judges.*

ST. EVE, *Circuit Judge.* Early in the morning on January 23, 2022, Javares Hudson walked into the Carle BroMenn Medical Center seeking emergency treatment for a gunshot wound. While an officer investigating the shooting stood outside Hudson's hospital room, medical staff discovered Hudson was concealing "something plastic" in his mouth. Medical staff spent nearly twenty minutes admonishing Hudson to spit out the item before he finally complied, revealing a device

used to convert a firearm into a fully automatic weapon. Hudson was subsequently indicted and moved to suppress the device, arguing that the medical staff acted as government agents in conducting a warrantless search. The district court denied the motion. Hudson pleaded guilty but reserved the right to appeal the denial of the motion to suppress. We now affirm.

## I. Background

### A. Factual History

A shooting took place outside a bar in Bloomington, Illinois in the early morning of January 23, 2022. Members of the Bloomington Police Department responding to the shooting reported that a vehicle left the scene with a shooting victim in the passenger seat. Bloomington Police Officer Benjamin Smith pursued the vehicle. Smith's body-worn camera recorded the ensuing events.

Smith arrived at the parking lot of the Carle BroMenn Medical Center and observed Javares Hudson exit the front passenger seat of the vehicle. In response to Smith's directive to put his hands up, Hudson repeatedly announced that he had been shot in his buttocks. Smith briefly frisked Hudson and then escorted him into the emergency room.

Medical staff immediately brought Hudson to a treatment room. Smith followed them, asking questions about the incident as medical staff began assessing Hudson's wound. As more staff entered the room, Smith took a few steps away from Hudson. After Smith informed a doctor that Hudson was not in custody, the doctor asked Smith to leave, stating, "I just don't want PD around." Smith responded that he was "not going to let [Hudson] out of his sight until we know

who's who in this scenario." After a short pause, he added, "I won't interfere. I will stay out of your way completely, sir. This is your show, I will work around you." The doctor walked away and began assisting Hudson without further comment.

About a minute later Smith left the room, standing quietly in the hallway directly outside of the room's open door. When the doctor exited Hudson's room about six minutes later, Smith asked, "Can we avoid washing his hands for the time being so that we can do a gunshot residue kit?" The doctor stated that he would not wash Hudson's hands because "that is not part of what [he] routinely do[es] for folks." Smith stated that he would wait to conduct the residue kit until it was "convenient" for the doctor, and the doctor returned to Hudson's room.

Officer Brandon Finke then arrived and joined Smith in the hallway. Shortly thereafter, the officers overheard medical staff stating that Hudson had something in his mouth. Numerous staff members directed Hudson to spit out the item, but Hudson refused.

Overhearing the commotion, Smith asked a nearby nurse if Hudson had something in his mouth, and the nurse confirmed that he had "something plastic" in his mouth. Smith then stepped inside the examination room, announcing: "They're trying not to kill you, okay? Just spit it out, okay? I'm not trying to charge you with drugs. Just spit it out." Medical staff did not acknowledge Smith's statement and continued admonishing Hudson to spit out the item. Presuming that Hudson was concealing drugs in his mouth, the doctor warned him that the drugs could get him "real sick" and that they could also prevent or obstruct treatment if he needed to

be intubated. Smith then piped up again, remarking, "They aren't going to treat ya, dude." In response, the doctor immediately walked towards Smith shaking his hands and stating, "Please don't, I don't want to …." The doctor then closed the curtain, blocking Smith's view of Hudson and the treatment room.

Smith returned to the hallway with Finke as medical staff continued their unsuccessful efforts to persuade Hudson to spit out the item. One medical staff member told Hudson that his throat could be occluded by the object if a breathing tube became necessary. Another stated, "They're not going to let you leave…. The cops are here and they're not gonna let you out of here without that out of your mouth."

Approximately ten minutes after first discovering the item in Hudson's mouth, the exasperated doctor again approached Smith:

> Doctor: He's got something in his mouth that he's not getting out of his mouth, and I don't want it to end up swallowed because it's evidence, he's going to end up sick.
>
> Smith: Absolutely. Absolutely. We're not trying to charge him with anything.
>
> Doctor: No, no, no. I told him everything on him, in him, is part of a crime scene, which, 'cause he was shot with a weapon. And he's not cooperating at this point. So, if you have ways to convince him, I feel like I don't know if he's in custody or not, or who's to say he's not in custody currently?
>
> Smith: He's detained, yeah.

Doctor: Oh, he's detained. Okay.

Smith: He's not free to leave.

Doctor: Great.

The doctor then returned to Hudson's room. A few minutes later, medical staffs' voices became more forceful. Their commands grew into a chorus: "Spit it out, those drugs are going to go in you!," "Stop chewing on it," and "Nobody cares about a little drugs, spit it out before you get yourself hurt." After the chorus faded without success, the doctor again implored Hudson to spit out the item, noting that Hudson was detained.

Finally, after nearly twenty minutes of coaxing, admonishing, and commanding, Hudson spit out the object. The object was not drugs, but rather a device used to convert a Glock firearm into an automatic weapon.

When the doctor exited Hudson's room once more, Smith asked if he could speak with Hudson and conduct the gunshot residue kit. The doctor stated that he wanted to conduct x-rays of Hudson first because it was the "medically right thing to do." Smith again stated, "No problem, sir, we'll work around you."

While Hudson was x-rayed, a staff member asked Smith whether Hudson would be charged for possessing the Glock component. Smith responded, "You guys have acted as an agent for us, so I don't know that I can charge him with it." Smith explained that police officers cannot ask private actors to do things that they cannot do themselves, but then noted, "This is a little bit different, because you guys have every right to ask him to do that." Surprised by Smith's comments, a staff

member responded, "We just really thought it was drugs, so we wanted him to spit it out."

**B. Procedural History**

Under federal law, the Glock component that Hudson had in his mouth constitutes a "machinegun" because it is used to convert a Glock firearm into a fully automatic weapon. Hudson was therefore indicted on February 15, 2022, on one count of possessing a machinegun in violation of 18 U.S.C. §§ 922(o), 924(a)(2).

Hudson moved to suppress the Glock component, arguing that medical staff acted as government agents when they directed him to spit it out, thereby conducting a warrantless search in violation of the Fourth Amendment. After a hearing, the district court held that medical staff did not act as government agents. The court found that medical staff acted with the purpose of providing medical treatment to Hudson and that Smith neither induced nor encouraged medical staff to act. The court alternatively held that even if medical staff had acted as government agents, the emergency-aid exception to the warrant requirement applied. The court therefore found that suppression was not warranted and denied Hudson's motion.

On September 8, 2022, Hudson entered a conditional guilty plea to the count charged in the indictment, reserving his right to appeal the denial of the motion to suppress. The district court accepted Hudson's plea and sentenced him to 33 months of imprisonment. The court entered judgment on January 13, 2023, and Hudson timely appealed.

**II. Discussion**

Hudson's only argument on appeal is that the district court erred in denying his motion to suppress the Glock component. The thrust of his argument is that medical staff acted as government agents when they ordered him to spit out the component, and thus their actions amounted to a warrantless search in violation of the Fourth Amendment.

**A. Standard of Review**

We review a district court's decision on a motion to suppress under a mixed standard of review. *United States v. Gholston*, 1 F.4th 492, 496 (7th Cir. 2021). We review the district court's legal conclusions and conclusions on mixed questions of law and fact de novo. *United States v. Bebris*, 4 F.4th 551, 560 (7th Cir. 2021). The district court's factual findings are reviewed for clear error. *Id.* "A factual finding is clearly erroneous only if, after considering all the evidence, we cannot avoid or ignore a 'definite and firm conviction that a mistake has been made.'" *United States v. Edgeworth*, 889 F.3d 350, 353 (7th Cir. 2018) (quoting *United States v. Jackson*, 598 F.3d 340, 344 (7th Cir. 2010)).

**B. The Fourth Amendment**

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. The Amendment protects citizens against unreasonable searches and seizures by the government; it does not apply to searches or seizures conducted by private individuals, no matter how unreasonable. *United States v. Ginglen*, 467 F.3d 1071, 1074 (7th Cir. 2006); *Bebris*, 4 F.4th at 560. But the government may not "simply enlist 'private'

individuals to do its bidding in an attempt to avoid its Fourth Amendment obligations." *Bebris*, 4 F.4th at 560; *accord United States v. Feffer*, 831 F.2d 734, 737 (7th Cir. 1987) ("The government may not do, through a private individual, that which it is otherwise forbidden to do."). Fourth Amendment protections therefore apply to a search or seizure conducted by an ostensibly "private" individual when the individual acts as an "instrument or agent" of the government. *United States v. Crowley*, 285 F.3d 553, 558 (7th Cir. 2002) (citing *United States v. Shahid*, 117 F.3d 322, 325 (7th Cir. 1997)).

The defendant bears the burden of proving that a private individual acted as an instrument or agent of the government in conducting a search. *Shahid*, 117 F.3d at 325. "To meet this burden, 'a defendant must prove some exercise of governmental power over the private entity, such that the private entity may be said to have acted on behalf of the government rather than for its own, private purposes.'" *Bebris*, 4 F.4th at 560 (quoting *United States v. Koenig*, 856 F.2d 843, 849 (7th Cir. 1988)).

There is "no rigid formula" for making such a determination. *Id.* at 561. Rather, a court should conduct the analysis "on a case-by-case basis in light of all the circumstances." *Crowley*, 285 F.3d at 558. We have nevertheless identified "two critical factors" to assist courts in the analysis: 1) "whether the government knew of and acquiesced in the intrusive conduct," and 2) "whether the private party's conduct was done with the purpose of assisting law enforcement or to further [its] own ends." *Bebris*, 4 F.4th at 560–61. "Other useful criteria are whether the private actor acted at the request of the government and whether the government offered the private actor a reward." *Ginglen*, 467 F.3d at 1074 (quoting *Shahid*, 117 F.3d at

325). The district court found that each of these factors pointed to the nonexistence of any agency relationship. We agree.

Hudson zeroes in on the "acquiesced" language of the first factor, arguing that Smith clearly knew of and acquiesced in medical staff's search because Smith maintained a constant presence both inside and outside his hospital room and stood idly by while staff directed Hudson to spit out the item.

Knowledge and inaction alone, however, are insufficient to establish an agency relationship. *See Crowley*, 285 F.3d at 559 ("The mere fact that the police witness a private party's search does not transform the private party into a governmental agent."); *Koenig*, 856 F.2d at 850 ("Mere knowledge of another's independent action, does not produce vicarious responsibility absent some manifestation of consent and the ability to control."). Rather, there must be both "government[] knowledge of the action (or of the policy or practice of performing such actions), combined with 'some exercise of governmental power over the private entity,' *i.e.*, 'some manifestation of consent and the ability to control.'" *Shahid*, 117 F.3d at 326 (quoting *Koenig*, 856 F.2d at 849, 850); *see also United States v. Day*, 591 F.3d 679, 685 (4th Cir. 2010) ("[T]here must be some evidence of Government participation in or affirmative encouragement of the private search before a court will hold it unconstitutional. Passive acceptance by the Government is not enough." (quotation omitted)).

Emphasizing the few short interactions between Smith and medical staff, Hudson insists that Smith did exercise such control here by encouraging the search and inducing medical staff to act. He points to a few isolated instances in which Smith was involved in the nearly twenty-minute event,

including that the doctor asked Smith for help in convincing Hudson to spit out the item, that medical staff mentioned the presence of police in attempting to convince Hudson, and that Smith made his presence known to staff and even, on occasion, directed Hudson himself to spit out the then-unidentified item. But, as the district court correctly observed, we cannot view these facts in isolation. *See Shahid*, 117 F.3d at 325 (instructing that review of whether an agency relationship exists should be "on a case-by-case basis and in light of all of the circumstances"). While we agree that Smith had some degree of interaction with medical staff, the district court did not clearly err in discounting this interaction and finding, based on all the circumstances presented here, that Smith did not attempt to induce medical staff to act or otherwise manifest any ability to control medical staff's actions. *See Bebris*, 4 F.4th at 561 (reviewing the district court's factual findings on the issue of whether the government induced a private party to engage in a search for clear error).

Hudson, for example, pulls out of context that, after an extended period of attempting to convince Hudson to spit out the object, the doctor asked Smith if he had any ideas on how to convince Hudson. The doctor also asked Smith if Hudson was detained, and when Smith responded that he was, the doctor leveraged that information in his attempts to convince Hudson to spit out the item. But in the same conversation, Smith disclaimed any interest in charging Hudson for drugs. Viewed in context, Smith's statement that Hudson was detained does not clearly evince an intent to induce action, as Hudson contends; Smith was simply answering the doctor's questions and did not direct the doctor to act in any particular way. Indeed, it would be difficult to find that Smith intended to induce the doctor or medical staff to obtain the suspected

drugs from Hudson's mouth where Smith affirmatively disclaimed any evidentiary interest in them. Absent any manifestation of consent and the ability to control, these facts do not transform medical staff's actions into a government search. *Cf. United States v. Chukwubike*, 956 F.2d 209, 212 (9th Cir. 1992) (holding that medical staff did not act as government agents where they acted on their own initiative to "search" the defendant but received some assistance from law enforcement officers in executing the search).

Hudson's reliance on other small interactions between Smith and medical staff are likewise undermined by the rest of the record. As the district court found, medical staff were uninterested in Smith's presence and even asked Smith to leave Hudson's room, so Smith stood outside the room for most of the events in question. When Smith attempted to interject in the attempts to get Hudson to spit out the item, medical staff ignored his first interjection, and the doctor shut the curtain in response to his second. Smith repeatedly assured medical staff he would stay out of the way, and his only request to the doctor during the entirety of the encounter was that Hudson's hands not be washed. And, even then, rather than simply complying, the doctor stated that washing hands was not something he normally did in treating patients with gunshot wounds. From all this, the district court could certainly conclude that Smith did not exercise any control over the search and medical staff were, in fact, calling all the shots. *See United States v. Leffall*, 82 F.3d 343, 348 (10th Cir. 1996) (observing that the court has never found agency where "government participation was as minimal" as an officer briefly inspecting the exterior of a package and then watching a private individual open the box and inspect its contents).

Turning to the second factor, Hudson also asserts that the district court erred in finding that medical staff acted with the purpose of providing medical care to Hudson and not to assist law enforcement. We disagree.

As an initial matter, we emphasize that a private individual's independent intent to assist law enforcement alone cannot "transform a private action into a public action." *Shahid*, 117 F.3d at 326; *see also United States v. Aldridge*, 642 F.3d 537, 541 (7th Cir. 2011) (stating that "[b]oth sides must agree" to the formation of an agency relationship, and "something more than approval" is necessary); *Koenig*, 856 F.2d at 849 (noting that the two critical factors "are not independently sufficient to convert a private search into a governmental search"). There also must be some governmental "manifestation of consent and the ability to control." *Shahid*, 117 F.3d at 326. Because we agree with the district court that Hudson failed to show any such manifestation here, it is of no moment whether medical staff's purpose—even if "sole or paramount"—was to assist law enforcement. *See id.*

Even if there had been some manifestation of consent and control here, we see no clear error in the district court's finding that medical staff did not act with a purpose of assisting law enforcement. *Ginglen*, 467 F.3d at 1074 (reviewing for clear error the district court's findings that private individuals did not act with a purpose to assist law enforcement). As the district court found, medical staff repeatedly expressed concerns for Hudson's safety when directing him to spit out the item and emphasized the health risks posed by the item if it stayed in his mouth. They also directed Hudson to spit out the item before Smith even knew that Hudson had anything

in his mouth. And, when Smith stated to medical staff that they had acted as his agents, they expressed surprise because they simply wanted Hudson to spit out the suspected drugs. Taken as a whole, these facts supported a finding that medical staff acted with the purpose of providing medical treatment.

Hudson contends that other evidence in the record belies any such finding. Specifically, he argues that medical staff could not have acted with a medical purpose because it was not medically necessary for him to spit out the item to obtain treatment for his "flesh wound." He further argues that, once he refused the "medical treatment"—i.e., spitting out the suspected drugs—medical staff's purpose in directing him to spit them out became purely to collect evidence because he had invoked his right to refuse medical treatment, thereby relieving staff of their obligation to provide such treatment.

Hudson misunderstands the relevant inquiry. It is not whether medical staff were correct about the medical necessity of their conduct, but simply whether they acted pursuant to a legitimate independent medical purpose as opposed to a desire to assist law enforcement. *See United States v. McAllister*, 18 F.3d 1412, 1418 (7th Cir. 1994).[1] Thus, even if it was not

---

[1] The extent to which a private individual's actions are actually warranted under the circumstances may be relevant in determining whether the private individual had a *legitimate* independent purpose in conducting a search. *See, e.g., United States v. Booker*, 728 F.3d 535, 545 (6th Cir. 2013) (finding that a doctor did not act with a legitimate medical purpose when the doctor proceeded to conduct a potentially unnecessary medical procedure that would ensure the retrieval of suspected contraband without first offering less intrusive alternatives). But this is simply a factor in answering the relevant question of what the individual's subjective purpose was in

medically necessary for Hudson to spit out the item, or if such a "treatment" was unwarranted in light of Hudson's invocation of his right to refuse medical treatment, that would not somehow nullify their subjective purpose to render medical treatment. *Cf. Chukwubike*, 956 F.2d at 212 ("Under normal circumstances, of course, [medical staff] should have had their patient's consent. But their judgment remained a medical one. It was not nullified by [the defendant's] refusal to give permission."); *see also Koenig*, 856 F.2d at 850 ("[O]nce the court is satisfied that a private entity has conducted a search for its own, private reasons and not as an instrument or agent of the government, the specific reason for the search no longer matters.").

In any event, we are unpersuaded that it was medically unnecessary for Hudson to spit out the item: medical staff operated under the assumption that he had drugs in his mouth, and repeatedly indicated that the suspected drugs could cause him to overdose if the container they were in ruptured. Although this assumption was ultimately mistaken, it does not undermine the fact that staff viewed it medically necessary for Hudson to spit out the item to prevent a second medical emergency from eclipsing the first. They also expressed concern that the item could cause Hudson to choke or occlude his throat if he needed to be intubated, further indicating that their concerns were not merely speculative, but were related to their treatment of his "flesh wound."

Hudson again lifts isolated statements out of context in an attempt to argue that staff intended to collect evidence rather

executing the search, not a basis in and of itself to deem an individual's purpose illegitimate.

than provide medical assistance. He points to the fact that the doctor mentioned that the item was "evidence" when asking Smith for help in getting Hudson to spit out the item. When viewed in context, however, the doctor's statement is much more innocuous. In the same sentence, the doctor expressed his concern that Hudson would swallow it and "end up sick." The district court's conclusion that this ambiguous statement "at best" could be construed as a request for help in accomplishing medical staff's medical purpose, and that the reference to "evidence" and a "crime scene" was because Hudson had been shot, was not clearly erroneous. *Cf. Shahid*, 117 F.3d at 326 (noting that a private party is not transformed into a government agent when they have both an intent to assist law enforcement and a "legitimate independent motivation for engaging in the challenged conduct" (quotation omitted)).

In sum, we conclude that the district court did not clearly err in finding that Smith did not induce medical staff to act and that medical staff acted with the primary purpose of providing medical care. Viewed together, these factors lead us to conclude medical staff did not act as government agents in directing Hudson to spit out the item.

That Smith afterwards indicated to medical staff that he believed they acted as his agents does not alter our conclusion here. Smith's after-the-fact, subjective speculation as to the existence of an agency relationship—a legal conclusion—does not override the effect of the underlying facts in this case. *See United States v. Martin*, 195 F.3d 961, 963 (7th Cir. 1999) (noting that "the ultimate question whether a private person is actually a government agent" is "a question that requires the application of a legal concept (agency) to facts"). And those

facts, when looked at objectively and in their totality, do not support the existence of an agency relationship.[2]

### III. Conclusion

Hudson has failed to sustain his burden of proving the existence of an agency relationship. Accordingly, the Fourth Amendment does not apply to the medical staff's actions, and the district court properly denied Hudson's motion to suppress on that basis.[3]

\*          \*          \*

The judgment of the district court is

AFFIRMED.

---

[2] This is not to say that a government actor's subjective belief as to whether an agency relationship exists would never be relevant to the analysis. As this court has stated, "[b]oth sides must agree … to the creation of the agency relationship." *Aldridge*, 642 F.3d at 541. One party's subjective belief as to the existence of an agency relationship may therefore have some value in determining whether such a relationship did, in fact, exist.

[3] Because we hold that no agency relationship existed and therefore the Fourth Amendment does not apply to the alleged search, we do not reach the government's alternative arguments regarding the exceptions to the Fourth Amendment's warrant requirement.