2010 VT 97

## State of Vermont v. Jason Young

[12 A.3d 510]

·No. 09-252

Present: **Reiber, C.J., Dooley, Johnson, Skoglund and Burgess, JJ.**

Opinion Filed October 29, 2010

*Thomas M. Kelly*, Washington County State's Attorney, Barre, for Plaintiff-Appellee.

*David Watts* of *Blodgett, Watts, Volk & Sawyer, P.C.*, and *Jason J. Sawyer, Law Office of Jason J. Sawyer*, Burlington, for Defendant-Appellant.

¶ 1. **Dooley, J.** Defendant Jason Young appeals from the denial of his motion to suppress evidence, obtained by a police officer after defendant drove into the driveway of the officer's house, and to dismiss his civil and criminal cases. Defendant contends that: (1) the trial court erred in determining that he was not seized when the officer initially followed him into the driveway; (2) the court erred in determining that the officer had the requisite reasonable suspicion to order defendant to exit his truck; and (3) the factual findings underlying the court's order on the motion to suppress were clearly erroneous. For the reasons discussed below, we affirm.

¶ 2. A little past ten o'clock on a mid-summer's eve, defendant departed Barre in his pick-up truck to return to his home in Marshfield, triggering an improbably unlucky — for him — sequence of events. Defendant had been socializing with friends after work and, as he put it, "had a couple of drinks." Shortly after defendant turned onto Plainfield Brook Road, a vehicle approached his truck from behind. Defendant testified that the vehicle was "approaching pretty rapidly," so he decided to take his next right onto Cassie Street, "assuming the vehicle would continue straight past." Much to defendant's dismay, the vehicle followed. Defendant turned right at his next opportunity, this time pulling onto Valley View Circle. Again, the vehicle followed. Defendant next began to search for an "available driveway to turn around in easily" and made his choice. He pulled into the driveway, "assum[ing] the vehicle behind [him] would continue

past." It did not. Defendant testified to thinking that, "coincidentally, the person must live there." He was correct. What he did not realize at the time, however, was that the vehicle was a police cruiser and the person who followed him and lived in the house was an off-duty police officer dressed in plain clothes.[1]

¶ 3. According to defendant's testimony, the vehicle that had been following him stopped along the side of the road when he pulled into the driveway. Defendant put his truck in reverse and began to back out, but the vehicle pulled into the driveway blocking defendant from exiting the driveway. Defendant pulled forward and, while rolling down his window to see if the lumber in his truck was going to hit anything, successfully navigated a turnaround so that he was proceeding out of the driveway. Defendant began rolling up his window when he noticed the officer, in defendant's words, "motion[] to me to hold on, I think." It was only at this point that defendant at last noticed that the vehicle allegedly blocking him was a police cruiser.

¶ 4. Defendant further testified that with their driver's-side windows open, the officer asked defendant what he was doing in the driveway, to which defendant replied that he was turning around. The officer next asked him where he was coming from and where he was going to, and defendant again gave responsive answers. The officer indicated that he could not hear defendant very well, and asked him to turn off the truck. He then "got out of his vehicle, without moving it at all and walked over to [defendant's] window." Defendant expressly testified that the cars were not side-by-side at that point, and that the officer had blocked him in the driveway.[2] Defendant did not testify regarding any of the events that followed.

¶ 5. The officer's testimony differed from that of defendant in several important respects. According to the officer, he was a "[l]ittle concerned" when he observed defendant pull into his driveway after ten o'clock at night, as his wife and children were inside the house. The officer testified that he had activated his garage door opener and that the door was going up as defendant drove "all the way into [his] driveway, near the door." The officer

---

[1] Defendant alleges that he did not discover that the vehicle was a police cruiser until after he completed a turnaround in the driveway.

[2] Defendant describes the vehicles as being positioned with their "bumpers about even" and that he "was at a slight angle" compared to the police cruiser.

pulled the cruiser into the driveway and stopped at the entrance to try to determine what defendant was doing. Defendant then "pulled forward, taking a rather wide turn, drove onto [his] lawn, straightened out and came back out towards the entrance of the driveway." The officer testified that defendant pulled his truck "pretty much side-to-side" with the police cruiser, so that the two could talk through their driver's-side windows, and the cruiser did not block defendant's truck from exiting the driveway. The officer also recounted that he did not roll down his window until after he observed that defendant's window was already down and that he never motioned for defendant to stop or to roll down his window.

¶ 6. According to the officer, he next asked defendant if he could help him. The officer testified that he "immediately detected a rather strong odor of intoxicants come out of the vehicle, just by the windows being down." When defendant indicated that he was turning around, the officer "notice[d] the speech was somewhat slurred." Based on the odor of alcohol emanating from the truck and the slurred speech, the officer asked defendant how much he had had to drink that night. Defendant allegedly responded, "three or four," followed by a short pause, and then, "maybe four or five." After asking defendant a few more questions and requesting his license, registration, and proof of insurance, all of which defendant provided without difficulty, the officer asked defendant to step out of his truck to perform certain sobriety tests. According to the officer, before getting out of his vehicle, the officer backed up his car so that he could open his car door without hitting defendant's truck. After a preliminary breath test indicated a BAC result of .178 percent and defendant exhibited difficulty performing various sobriety tests, the officer processed defendant for driving under the influence.

¶ 7. Prior to trial, defendant moved to suppress the evidence obtained during the driveway encounter and to dismiss the civil and criminal proceedings against him. Defendant argued that the police officer did not have "the requisite reasonable and articulable suspicion to stop and seize [him]," and lacked a "reasonable and articulable suspicion of DUI to order [him] to exit his vehicle or proceed to process him for DUI."[3] He further argued that the

---

[3] Although defendant cited Chapter I, Article 11 of the Vermont Constitution in his memorandum to the trial court and in his brief to this Court, he argued that it would produce a different result than the Fourth Amendment to the United States

officer's request that defendant take a preliminary breath test "was based upon insufficient 'reason to believe' [defendant] was impaired." The trial court denied the motion, first concluding that the initial encounter was not a seizure, as the officer "was acting consistently with any other homeowner wondering what this individual was doing all the way up his driveway late at night." The court noted that "[i]t is reasonable for a homeowner in these circumstances to stop an operator to inquire whether he is lost or in need of assistance." In other words, the court concluded that the officer was acting as a homeowner during the initial encounter, and not as a police officer. The court determined that no seizure occurred until the officer ordered defendant out of his truck and requested that he perform the sobriety tests. By this point, the court concluded, the stop was justified, noting that defendant "smelled strongly of alcohol, had bloodshot and watery eyes, and had slurred speech."

¶ 8. Defendant ultimately entered into a plea agreement with the State conditioned on the outcome of this appeal. On appeal, defendant argues that the trial court erred in: (1) finding that the encounter between the officer and defendant was not a seizure until defendant was ordered to exit the truck; (2) finding that the exit order was based upon reasonable and articulable suspicion; and (3) making its factual findings. We reject each of these arguments.

¶ 9. A motion to suppress raises a mixed question of law and fact. *State v. Pratt*, 2007 VT 68, ¶ 4, 182 Vt. 165, 932 A.2d 1039. We review a trial court's legal conclusions de novo and accordingly afford them no deference. *State v. Fletcher*, 2010 VT 27, ¶ 8, 187 Vt. 632, 996 A.2d 213 (mem.). We give substantial deference, however, to the trial court's findings of fact and we will uphold them unless, "taking the evidence in the light most favorable to the prevailing party, and excluding the effect of modifying evidence, there is no reasonable or credible evidence to support them." *State v. Mayo*, 2008 VT 2, ¶ 12, 183 Vt. 113, 945 A.2d 846 (quotation omitted). When testimony conflicts, we will not disturb

Constitution only with respect to the officer's order that defendant exit his vehicle. Thus, we do not consider Article 11 in relation to the main question in this appeal — whether the initial seizure was private and not prohibited by the Fourth Amendment. See *State v. Forty*, 2009 VT 118, ¶ 23 n.2, 187 Vt. 79, 989 A.2d 509 (declining to consider claim under Vermont Constitution when defendant failed to distinguish analysis from that under United States Constitution).

the trial court's decision to credit a particular witness absent some compelling indication of error, *Okemo Mountain, Inc. v. Lysobey*, 2005 VT 55, ¶ 12, 178 Vt. 608, 883 A.2d 757 (mem.), for it is within the province of the trial court to assess witness credibility and the weight of the evidence. *State v. Dixon*, 2008 VT 112, ¶ 34, 185 Vt. 92, 967 A.2d 1114.

¶ 10. Defendant first contests the trial court's conclusion that he was not seized until the officer ordered him to exit the truck. Defendant alleges that the officer partially blocked his egress from the driveway with the police cruiser and gestured for him to stop, and that this conduct amounts to an unconstitutional seizure within the scope of the Fourth Amendment to the United States Constitution. In assessing this argument, we note that the police officer testified that he did not block defendant's egress and that he did not motion for defendant to stop. The trial court did not resolve the conflict in the testimony, however, because it decided the motion on a different theory. Nevertheless, even accepting defendant's version of events as true, we agree with the trial court that there was no seizure until the officer had grounds to do so. In reaching this decision, we concur with the trial court's conclusion that the officer was initially acting as a concerned homeowner, and not as a police officer, and that his conduct during the initial encounter therefore fell outside the scope of the Fourth Amendment.

¶ 11. We note, at the outset, that there is little question defendant would have no constitutional claim if a private citizen, who is not a police officer, engaged in the same conduct as the officer in this case and, on observing signs of intoxication, called the police. Thus, our initial question is whether an off-duty police officer can engage in the same conduct as a private homeowner without causing an unconstitutional seizure. Defendant's argument assumes that he cannot — that is, for Fourth Amendment purposes, an officer must be viewed as a law enforcement agent and not a private homeowner, even with respect to actions in his own driveway. The law is decidedly against defendant's position. See generally 1 W. LaFave, Search and Seizure § 1.8(d), at 298 (4th ed. 2004) ("[A] search is private if the off-duty officer was at that time acting as a private individual rather than as a policeman.").

¶ 12. The current state of the law is based on the fundamental proposition that the "Fourth Amendment, and the accom-

panying rule of exclusion, apply only to government action." *Commonwealth v. Leone*, 435 N.E.2d 1036, 1039 (Mass. 1982); see generally *United States v. Jacobsen*, 466 U.S. 109, 113 (1984); *Burdeau v. McDowell*, 256 U.S. 465, 475 (1921). This proposition reflects not only the limit on the reach of the Fourth Amendment but also the limited rationale of the exclusionary rule to deter unconstitutional conduct, a rationale that would have little effect on a private person who is not acting to secure a criminal conviction. *Leone*, 435 N.E.2d at 1039.

¶ 13. This proposition applies equally to governmental employees who are acting in a private capacity at the time of the challenged search or seizure. See *State v. Andrews*, 637 A.2d 787, 790 (Conn. App. Ct. 1994) ("[I]f an individual is acting in a private capacity at the time of a search and seizure there is no governmental action."); *State v. Walker*, 459 N.W.2d 527, 532 (Neb. 1990) ("[W]e hold that a search by an off-duty law enforcement officer in his or her capacity as a private citizen, and not as a law enforcement officer, does not violate the prohibition against unreasonable searches and seizures."). Thus, whether there is governmental involvement in a search and seizure is determined by the capacity in which the person performing the search or seizure acts and not by the primary occupation of that actor. See *United States v. Couch*, 378 F. Supp. 2d 50, 55 (N.D.N.Y. 2005); *In re Albert S.*, 664 A.2d 476, 484-85 (Md. Ct. Spec. App. 1995); *State v. Cole*, 2008 WI App 178, ¶ 13, 315 Wis. 2d 75, 762 N.W.2d 711.

¶ 14. Any determination of whether an off-duty police officer is acting as a private person when making a search or seizure must be based on all the circumstances of the case. In *Walker*, a case in which an off-duty police lieutenant found signs of narcotics use while acting in his capacity as a landlord, the Supreme Court of Nebraska stated that "[w]hether a private person's search is actually a search by the State depends on whether the private person must be regarded as having acted as an instrument or agent of the State." 459 N.W.2d at 531. The court rejected the notion that "solely because one is a police officer, the officer acts in that capacity at all times," and found that, although the lieutenant relied on his professional training in recognizing the significance of drug paraphernalia at his rental property, that factor was unimportant in determining whether he was acting in his private or law enforcement capacity. *Id.* at 532-33. We find this analysis helpful.

■ ¶ 15. In this case, the officer was acting initially as a concerned homeowner and family member as he observed defendant's vehicle enter his driveway late at night. While it might be difficult to determine the capacity of the officer in some circumstances, see LaFave, *supra*, § 1.8(d), at 299, there can be no substantial doubt that the officer here was acting to protect his property and family, and the trial court so found. Thus, we look to whether the officer's behavior thereafter was consistent with the private motivation. In this case, the officer spoke to defendant in a conversational tone and did not command, threaten, or assert any force towards defendant in any way. He blocked defendant's exit, if at all, to ask questions to determine why defendant's vehicle was in his driveway. As the trial court correctly noted, these actions are consistent with the behavior of a concerned homeowner. Defense counsel in fact conceded this point during the suppression hearing, stating, "[w]ould I have probably done the . . . same thing and said 'What's your . . . business in my place?' Yes." Had the homeowner been a private citizen, his conduct would have been unremarkable and, indeed, even expected. Therefore, we find that the officer's conduct during this initial encounter was entirely consistent with his private motivation. In fact, the officer's occupation is likely to heighten his private motivation to protect his family. See *Armstrong v. State*, 46 So. 3d 589, 595 (Fla. Dist. Ct. App. 2010) (concluding that F.B.I. agent had private purpose in opening package sent to him at his home, and his concern about content of package was "heightened due to the fact that, as an F.B.I. agent, he was a likely target for threats").

¶ 16. We recognize that there is an issue as to whether the officer's questions turned into a law enforcement interrogation that went beyond the private purpose of the initial encounter.[4] This is particularly true of the question asking how many drinks defendant had consumed. We note, however, that the trial court did not rely upon the answer to this question in finding reasonable suspicion, and we likewise have not relied upon that answer.

---

[4] The trial court found that a seizure for constitutional purposes occurred when the officer ordered defendant to exit his vehicle. We agree that the "public" seizure occurred after the officer first spoke with defendant and observed his slurred speech and smelled the strong odor of alcohol. We agree that it occurred no later than the exit order. For purposes of this decision, we need not specify its exact time of occurrence.

As we discuss in more detail below, by that time the officer's actions were irrelevant to the question before us because the grounds for the further seizure had already emerged from the officer's interactions with defendant. See *Armstrong*, 46 So. 3d at 596 (actions taken after misdelivered package was opened were "irrelevant as to whether [F.B.I. agent] was acting as a law enforcement officer at the time the package was opened"); *Cole*, 2008 WI App 178, ¶ 20 (concluding that actions of police officer after opening and reading letter misdelivered to her home were irrelevant); .see also *Johnson v. State*, 823 So. 2d 1, 43 (Ala. Crim. App. 2001) ("[W]hen an off-duty police officer . . . suspects criminal activity, the officer's status changes and, from that point on, he is considered to be acting in his capacity as a police officer and not in his capacity as a private citizen.").

¶ 17. This case is in many ways similar to three decisions from other courts that have dealt with comparable circumstances. In *People v. Wachter*, 130 Cal. Rptr. 279 (Ct. App. 1976), a sheriff, on his day off, accompanied a neighbor on a social visit to the defendant's property. Finding no one home, the neighbor decided to show the sheriff various interesting features of the property, and the two stumbled upon a cultivated plot growing marijuana plants. Upon returning home, the sheriff reported his observations to the narcotics investigator in his office, who obtained a search warrant and seized the plants. In response to a motion to suppress, the court concluded that there was no unlawful search because the sheriff was acting as a private citizen, as he was off-duty and not engaged in active police work at the time of the discovery. See *id.* at 286.

¶ 18. The other two cases involve defendants as unlucky as defendant in this case. In one, *State v. Cole*, 2008 WI App 178, the defendant sent letters to family members instructing them to prevent the defendant's wife from testifying against him in a domestic violence prosecution, but one of the letters was misaddressed and delivered to the home of a deputy sheriff who read it and turned it over to the prosecution. The court concluded that "[t]he activity [the deputy] was engaged in when she opened [the defendant's] letter — opening mail that had been delivered to her home — was that of a private citizen." *Id.* ¶ 19.

¶ 19. Similarly in *Armstrong v. State*, 46 So. 3d 589, the postal service mistakenly delivered to the home of an F.B.I. agent a package containing marijuana and addressed to the defendant.

Again, the law enforcement officer opened the package and turned it over to the police. Concluding that the agent acted "in his private capacity when he received the package . . . [as it] was delivered by the postal service to his home" and that this capacity did not change even though he had the package x-rayed and opened at the F.B.I. office, the court concluded that there was no violation of the Fourth Amendment. *Id.* at 595. For the same reasons that the courts found no violation of the Fourth Amendment in *Wachter, Cole,* and *Armstrong,* we find no violation here with respect to the officer's blocking of defendant's exit and asking the initial questions.

¶ 20. We turn next to defendant's contention that the officer did not have the reasonable and articulable suspicion required under the Vermont Constitution to order him to exit the vehicle. Specifically, defendant argues that the trial court erred in concluding that the officer developed a reasonable and articulable suspicion of criminal wrongdoing based upon: (1) the odor of alcohol emanating from defendant's truck; (2) the officer's observation that defendant's eyes were watery and bloodshot; and (3) the officer's observation that defendant's speech was slurred. We find no error in the trial court's conclusion.

¶ 21. The issue of whether the officer had a sufficiently reasonable and articulable suspicion to require the operator to exit the vehicle and to perform field sobriety exercises is controlled by our recent decisions in *State v. Mara,* 2009 VT 96A, 186 Vt. 389, 987 A.2d 939, and *State v. Santimore,* 2009 VT 104, ¶ 8, 186 Vt. 638, 987 A.2d 332 (mem.). In *Mara,* we held that an officer was justified in ordering the defendant to exit the vehicle after detecting the odor of alcohol and observing the defendant's bloodshot and watery eyes, and after the defendant admitted to drinking. *Mara,* 2009 VT 96A, ¶ 12. In *Santimore,* 2009 VT 104, ¶ 8, we held that "[i]ndicia of intoxication, such as an officer's detection of the odor of alcohol emanating from a driver as well as observation of a driver's watery and bloodshot eyes, are sufficient to establish reasonable suspicion of DUI." We conclude that under these precedents the strong smell of alcohol and defendant's slurred speech are sufficient indicia of driving under the influence to allow the officer to go further and initiate field sobriety exercises.

¶ 22. Defendant argues that the earlier cases should be distinguished because the officer here testified that the odor of alcohol

came from inside the vehicle, rather than from defendant. This is a meaningless distinction. Where the officer is communicating with defendant through an open vehicle window and smelling alcohol from the same source, it is difficult to see how the officer could distinguish the precise source of the alcohol smell. Indeed, the court found that defendant "smelled strongly of alcohol," an inference it was entitled to draw. Further, we see no meaningful difference between the bloodshot and watery eyes observed in *Santimore* and the slurred speech observed in this case.

¶ 23. Lastly, defendant contends that the trial court erred by making findings that were not supported by the record and by ignoring certain facts in the record. We will affirm a trial court's findings of fact unless they are clearly erroneous. *Cassani v. Hale*, 2010 VT 8, ¶ 25, 187 Vt. 336, 993 A.2d 422. The trial court is afforded great discretion in making factual findings because it is in the best position to assess the credibility of witnesses and the weight to be given to evidence. *DeBartolo v. Underwriters at Lloyd's of London*, 2007 VT 31, ¶ 23, 181 Vt. 609, 925 A.2d 1018 (mem.).

¶ 24. Defendant first argues that the trial court erred in concluding that the officer observed defendant's watery and bloodshot eyes prior to ordering him to exit the vehicle so that the officer could administer field sobriety tests. Defendant is correct; the officer's supplemental affidavit indicates that the officer observed the condition of defendant's eyes only after defendant had exited his vehicle. Although the trial court erred in concluding that defendant's bloodshot and watery eyes in part justified the exit order, we find this error harmless. See V.R.C.P. 61 (defining harmless error); V.R.Cr.P. 52 (same). As noted above, the strong odor of alcohol and defendant's slurred speech were sufficient to justify the order. Thus, removing defendant's watery and bloodshot eyes from consideration does not alter the conclusion that the officer had reasonable suspicion to go forward with the field sobriety tests.

¶ 25. Defendant additionally contends that the trial court ignored evidence that demonstrates that the officer did not have the requisite level of reasonable suspicion to justify his actions. Specifically, defendant points to the following record facts, which he claims were ignored by the court: (1) defendant had no difficulty producing his license and registration when asked; (2)

the officer observed no erratic operation or traffic violations by defendant; and (3) the officer observed defendant successfully negotiate a turn in the driveway.[5] Contrary to defendant's argument, the trial court expressly noted in the "Facts" section of its decision that the officer did not observe any motor vehicle violation or other erratic operation and that defendant turned around in the officer's driveway.[6] The court also impliedly recognized that defendant successfully produced his license and registration when asked. The fact that the court did not discuss these facts in its "Conclusions" section does not indicate that it ignored them. Rather, the court apparently gave greater weight to the other record facts, and it is the province of the trial court to assess the weight to be given to evidence. *Harman v. Rogers*, 147 Vt. 11, 16-17, 510 A.2d 161, 165 (1986). We accordingly find that the trial court properly considered the relevant circumstances when it concluded that the officer had reasonable suspicion to initiate the field sobriety tests. We thus uphold its denial of defendant's motion.

*Affirmed.*

---

[5] Defendant also alleges that the trial court failed to consider a station house processing videotape revealing defendant's allegedly lucid speech. The court expressly stated in a footnote, however, "[t]he videotape notwithstanding, the Court cannot conclude that the officer's opinion as to the quality of defendant's speech was incorrect." As already discussed, it is within the province of the trial court to assess witness credibility, *Dixon*, 2008 VT 112, ¶ 34, and we therefore defer to the court's conclusion regarding the correctness of the officer's assessment.

[6] The trial court noted that defendant turned around in the driveway, but did not describe it as successful. The officer testified that defendant's vehicle went on to the officer's lawn when defendant made the turn, but the court did not address this evidence.